## JOHN BINNS v. STATE.

No. A-9296. April 21, 1938.
(78 P. 2d 837.)

Ernest R. Brown, of Pryor, and E. H. Beauchamp, of Grove, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., for the State.

PER CURIAM. John Binns, the defendant in the trial court, was by information charged with the crime of murder, by beating Norman Sager with a dangerous weapon; was tried, convicted of manslaughter in the first degree, and sentenced to be imprisoned in the state penitentiary for a term of five years. The record was properly saved, and the defendant John Binns has appealed to this court.

The state to maintain its allegations called Leona Hendren, who in substance stated she lived about 14 miles southeast of Jay, on Spavinaw creek, in Delaware county, Okla.

"On the 22nd day of October, 1932, I was keeping house and taking care of Carl Reeser's children; during the afternoon and evening Norman Sager and Jesse Hanna was at the Reeser home; the Reeser children and my brother Blue Hendren were also there. Norman Sager and Jesse Hanna came in about 4 o'clock in the afternoon.

"John Binns came to the Reeser home about 9 o'clock that night; when John Binns came Norman Sager was there but Jesse Hanna had gone to town to a dance. Jim Kelly came with John Binns to the Reeser home. I had written John Binns a letter that week telling him to come over Saturday night. I had only gone with Norman Sager once after John Binns and I had busted up. I and Alice and Norman Sager and Jesse Hanna were talking about going to the dance. Alice and Jesse Hanna went to the dance and came back after a while to stay with the children until we went over. Norman Sager decided he would stay until John came; a short while after Alice went to the dance she came back to the house and told me John was down at the dance.

"I advised Norman Sager that John Binns would be there after me, and he replied, 'Let him come, I will take care of him,' that he wasn't running from anybody. Alice started back to the dance and about that time a car drove up, and Alice told me John was in the car; John came to the porch and saw Norman sitting there and asked Alice to tell me to come out there, he wanted to tell me something, and I told Alice to tell him to wait a minute, and he replied,

'Come on, now.' I told him we had quit anyway and if he was in such a hurry to go ahead.

"In a few minutes Tobe came and asked me if we had a tire pump, that John wanted to borrow it, and I replied that it was out in the car; he got the pump for John, and John came in and told me he had a letter he wanted me to read; I took the letter and went up to the dresser, John was standing behind me; I do not know whether he had the pump in his hand at the time or not. He got me by the hand to go into the kitchen, he wanted to talk to me and we went on back. Norman was sitting on the foot of the bed when John struck him with the pump. John said, 'Hello, Norman, how are you?' and Norman said, 'Just fine, how are you.'

"John and I came into the room from the west and Sager's back was to us; when we came into the room Sager was just sitting up with his arms in front of him (indicating); nothing further was said after we came in from the kitchen between the deceased and John Binns. I could not say how many licks John hit Norman with the tire pump, it was more than one I am sure; I grabbed hold of John and asked him what he meant, and he ran over there in the kitchen and went out of the kitchen door, running as he left. The tire pump was a heavy pump; I don't know whether I would know it or not. I put three marks, these three X marks, like this on the pump. I would identify this as being the pump. John Binns gave this pump to me about three months before this trouble.

"I did not see the defendant any more that night; after the licks were struck I got a pan of water and commenced bathing Norman Sager, he was rolling on the bed; when I was bathing him I said, 'Norman, are you hurt?' but he never did answer me. I did not see the wounds but there was blood running down his face and out of his ear. The wounds were on his head. I sent Blue Hendren, Rose and Tobe Reeser after Alice Reeser, and the Doctor, and also the law. Norman Sager's mother and brother came and got him and took him to the hospital at Miami. I did not go to the hospital. When the licks were struck Jim Kelly, Blue Hendren, Tobe and Rose Reeser and some other children were in the room."

On cross-examination witness stated:

"Jim Kelly was sitting over on the east side of the room in front of the door in the north end of the south room; Kelly was drunk at the time; when I came in from the kitchen I saw the deceased, Jim Kelly and John Binns; I kinda fussed with John for bringing Kelly with him and he said he would take him home. The next morning when I swept I found a knife and an iron, the iron was a long car spring like. The knife was kinda back under the foot of the bed. I don't know whether I would recognize the knife or not. The knife was open when I found it; I gave the knife to my sister Beulah Starr.

"No one had been in the house that night excepting the family and myself. That night when I was setting supper Norman was in the kitchen and I wanted to open a can of condensed cream, and Norman pulled out his knife and opened it and handed it to me. All I can say I know he used it to open the can, it was a black handled knife. I did not pay much attention to it.

"The defendant John Binns and I have been friends for some time but had been at outs for about three weeks; I had gone with Norman Sager once in the meantime. I had gone with Binns before our falling out for about 13 months. He had visited me often. I saw Binns on Sunday before this difficulty and had a conversation with him. It was about 5 o'clock in the afternoon when I told Mr. Sager that John Binns was coming that night; I told him I had written John and was looking for him to come down that afternoon or evening. I do not remember that John ever left the house from the time he came in until he left after the trouble."

Dr. M. M. DeArman, of the Baptist Hospital, at Miami, testified to the official records of the hospital, which show that Norman Sager died at 11:40 a. m. Wednesday—October, 1932.

Mrs. J. D. Sager, the mother of Norman Sager, testified that on the 22nd day of October, she lived about 12 or 14 miles west of Jay, off highway No. 29; on that date she had three children, Ray, Norman, and Leonard Sager:

"On the 22nd day of October, 1932, I went to Southwest City, Mo., and Norman came back with me as far as Jay

and stopped there. The next time I saw him was about 11 or 12 o'clock that night at Mr. Reeser's house in Jay. I know Leona Hendren, she was at the house where Norman was when I arrived.

"When I arrived at Reeser's home Norman was lying as though he was sleeping; I went in and called him and he did not answer; his brother Ray shook him and he did not answer; he had wounds on his head and his ear was bleeding; the wounds were bleeding a little and blood was coming out of his ear quite a bit; we removed him to the hospital at Miami about 3 o'clock Sunday morning; he stayed there until about 11 o'clock on Wednesday morning; during all this time he was unconscious; he was in a raving condition, did not know anyone, we had to hold him all the time; he did not know me. About 11 o'clock Wednesday morning he passed away at the hospital."

Leona Hendren and several other witnesses testify as to the defendant being at the Reeser home, and also that the deceased was there. All of the witnesses testify in substance as did Leona Hendren.

The defendant, John Binns, testifying in his own behalf stated:

"I live four miles west of Gentry, Ark.; on October 22, 1932, I was 19 years old; I know Leona Hendren; have known her practically all my life; had been keeping company with her about 18 months. I saw her on Sunday before the 22nd of October, 1932; I know Lafe and Beulah Starr; I was at their home the week before this trouble I think.

"Norman Sager had some conversation with me as I started in on the porch of the kitchen; he was standing near Lafe Starr, cursing and telling what he was going to do; I went on past them and into the front room where the women were. Lafe told him he was not going to have any trouble there; he got Joe Duncan and Mr. Patterson to take him off. This was about two weeks before the trouble.

"I saw Mrs. Starr subsequent to that; she said Norman Sager told her that inside of three weeks she would hear of Norman Sager killing me. I arrived at the Carl Reeser home about 9 o'clock in the evening; I did not have a weapon

of any kind; I got out and went into the house. Leona Hendren, Norman Sager and the children were there; as I went in I called Leona into the kitchen, and while I was there talking to Leona, Blue Hendren told me Norman went and got the iron, which I saw him get; Tobe Reeser told me the same thing; the iron he got was a car spring; I saw he had a pocket knife; I talked with Leona a few minutes, she said Norman was mad, and had told her he would take care of that s——o——b——; she told me to get Jim Kelly and leave and save having any trouble, and I told her I would. As I went in to get Jim Kelly, Leona was in front of me and Norman Sager; Sager raised up and struck at me with his pocket knife; I hit him twice with the tire pump. I did not use any more force than was apparently necessary to defend myself. I told Jim Kelly to come on and Jim went out ahead. I did not see Norman Sager any more.

"This is the first time I have ever been arrested for any trouble. The tire pump belonged to my father, Miss Hendren knew that; I did not tell anyone I had a flat; the only time I hit him we were standing face to face. I never made a statement to anyone that I would do any violence to Norman Sager. Norman was standing when I hit him; as Leona walked round him, where he was sitting on the bed, he raised up with his pocket knife facing me, and he said 'I will kill the s——o——b.' He tried to step back and I hit him with the pump."

On cross-examination defendant stated:

"When I come in the house I told 'Norman Sager hello, and asked him how he was; he said, 'All right.' He was up off the bed before I came in from the kitchen to the room where he was; I could see him; I don't remember talking to Jim Kelly; there were several children in the room and around the house; the licks I struck Sager took effect in the left side of his head; I don't remember that Leona grabbed my arm. Sager had the knife in his right hand when he got up and was kindly facing northeast; I was close enough for him to reach me with his knife and I hit him with the pump; he was probably 18 inches from the bed at the time. I hit right handed and he went back toward the bed and wall. I was at the foot of the bed. When I hit him the first time I did not stop him, he kept coming on, then I hit him again; he had a knife; he did not have the iron in his hand

when I hit him. When I left the house I went east up through the woods, I was driving slow, after I had the wreck and the other car came up I walked away."

Alice Dunham testified in behalf of the defendant as to the statements made by Norman Sager at the Reeser home when Leona tried to get him to leave, in which she says Norman Sager stated, "Let the s——o——b come I will take care of him, if that is the way he feels about it." Leona had tried to get Norman to leave the Reeser home.

Other witnesses testified in behalf of the defendant and to different facts surrounding the visiting of the parties and leading up to the killing, which it is not deemed necessary to set out in detail. The foregoing is the substance of the testimony deemed necessary to set out and the fact the defendant has not deemed it necessary to file a brief in support of his assignment of errors.

Eight errors have been assigned by the defendant which he alleges are sufficient to reverse his case. The only error this court will consider will be the first assignment, which is as follows: "Said court erred in overruling the motion of the plaintiff in error for a new trial."

The record has been carefully read and examined, and discloses a sad condition of affairs in which one citizen of the county takes the life of another at the home of a neighbor and friend. It is undenied by the defendant that he inflicted the wounds upon the head of Norman Sager, the deceased, with a tire pump, from the effects of said wounds Norman Sager died. The defendant insists the deceased struck at him with a knife when he hit him with the pump, and that the deceased also had a broken car spring in the corner near where he was sitting.

The fact that the defendant left and was not taken into custody for some time after the killing is immaterial so far as the record in this case shows. When the defendant took the stand in his own behalf, he admitted the part he

had taken in the fight which resulted in the death of Norman Sager.

The record has been carefully examined; no brief has been filed in support of his assignment of errors; and there is nothing in the record to show that the court committed error in overruling the defendant's motion for a new trial. There was no appearance made for oral argument when the case was assigned for hearing.

An examination of the record discloses no jurisdictional or fundamental errors. The defendant was accorded a fair and impartial trial. The instructions of the court correctly advised the jury as to the law applicable to the facts in the case. The evidence is sufficient to sustain the judgment.

The judgment of the trial court is affirmed.